**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Maria Orozco Gonzalez, | No. CV-17-04593-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| City of Glendale, et al., | |
| Defendants. | |

Pending before the Court is Defendants Carl Westbrooks' and the City of Glendale's (hereinafter "Defendants") Motion for Summary Judgement and Memorandum of Points and Authorities. (Doc. 76, "Mot.") Plaintiff Maria Orozco Gonzalez responded, (Doc. 85, "Resp."), and Defendants replied. (Doc. 86, "Rep.") Both parties filed separate statements of fact with multiple attached exhibits. (Doc. 77, "SOF"; Doc. 84 at 1-16 "CSOF"; *id.* at 17-22, "ASOF".) After considering the motions, the Court enters the following Order:

## I.    BACKGROUND

Plaintiff worked as a Personal Computer "PC" Operator for the Utilities Department of the City of Glendale (hereinafter "the City") from 2000 to 2015, entering work orders into a software program the City calls "Hansen."" (SOF ¶¶ 1, 18; Doc. 84-1 at 3.) Defendant Carl Westbrooks supervised Plaintiff from 2011 until her resignation in 2015. (SOF ¶¶ 18, 58.) While supervising Plaintiff, Westbrooks conducted annual performance reviews, regularly consulted with Plaintiff regarding her job performance, and once,

formally counseled Plaintiff's alleged failure to follow the City's Family and Medical Leave Act ("FMLA") guidelines, a counseling that resulted in a Memo of Expectations ("MOE"). (*See* Doc. 84-1 at 77, 127-64, 182, 257-60, 269.) Plaintiff contends that through these supervisory practices and other conduct, Westbrooks and the City violated her rights under the FLMA, Title VII, and the Americans with Disabilities Act ("ADA"). (Doc. 55 at 6-9.)

### A. <u>Plaintiff's Health Conditions and FMLA Requests</u>

Plaintiff suffers from "digestive problems, and urinary tract infections, as well as severe allergies and asthma." (Doc. 84-1 at 3.) To treat her conditions, Plaintiff began requesting leave under the Family and Medical Leave Act (FMLA), (Doc. 77-2 at 56), formally seeking approval for FMLA leave on six occasions from 2013-2015—three times for personal medical conditions and three to support her spouse. (Doc. 77-2 at 54-81 and 100-102.) The City approved each request. (Doc. 77-2 at 3-5.) Of note, the City approved Plaintiff's FMLA requests for intermittent leave of one hour per week for allergy injections in October 2014, (Doc. 77-2 at 56), two to three weeks of leave for carpal tunnel surgery in February 2015, (*id.* at 102), and intermittent leave with up to five flare-ups a year for chronic headaches, rhinitis, sinusitis, and asthma in November 2015, (*id.* at 59). And although the City does have a Disability Accommodation policy, Plaintiff did not apply. (*Id.* at 2.)

### B. <u>Alleged Conduct</u>

Plaintiff argues Westbrooks engaged in discriminatory and retaliatory conduct because of her health conditions, use of FMLA, and her sex. (Doc. 55 at 6-9.)

#### a. **Plaintiff's FMLA Leave Requests**

On the morning of January 5, 2015, Plaintiff asked Westbrooks for permission to go home because she did not feel well. (Doc. 84-1 at 80; Doc. 77-1 at 73.)[1] Wanting advice from City's Human Resources department (HR) before allowing Plaintiff to leave work,

---

[1] Although Plaintiff mentions FMLA coverage in later communications about the incident with City Human Resource employees, there is no direct evidence that Plaintiff's request identified FMLA.

Westbrooks asked Plaintiff to remain in the office pending further guidance. At this point, according to Plaintiff, Westbrooks himself left the office with no further communication. (Doc. 84-1 at 4). With Westbrooks allegedly gone, Plaintiff sought guidance from HR employee Craig Sullivan, inquiring over email whether her supervisor can deny her request to go home if she doesn't feel well, has a doctor's note, and has FMLA. (Doc. 77-1 at 73.) Sullivan forwarded Plaintiff's message to another HR employee, Kerry Sheward, and asked her to contact Plaintiff directly. (*Id.*) Sheward promptly e-mailed Plaintiff to clarify her reasons for leaving. (Doc. 77-1 at 76.) In her response to Sheward, Plaintiff failed entirely to explain what prompted FLMA leave request that morning and instead discussed an absence the previous Friday related to a recent surgery. (*Id.*)

The next day, January 6, 2015, Plaintiff spoke with three City employees—former supervisor Mark Fortkamp and two HR employees—about the previous day's events. First, Plaintiff explained to yet another HR employee, La Trisse Kuzinski, that she requested leave the day pervious because she was "wheezing and needed to take a breathing treatment." (Doc. 84-1 at 4.) Plaintiff again alleged that when Westbrooks returned to work on January 5, he told Plaintiff that "FMLA doesn't protect your job like you think it does" and that Plaintiff should "train [the temporary employee] up to par . . . so [she will] get to know my job because we never know what may happen[.]"[2] (*Id.*) Next, Plaintiff followed up with Sheward. (*Id.* at 84.)[3]  But, in Sheward's account of that conversation, Plaintiff admitted that she did not tell Westbrooks that her request to leave work was connected to her FMLA-covered condition and further admitted to improperly designating unrelated absences as FMLA-approved. (*Id.*) Sheward memorialized that conversation in an e-mail which also provided Plaintiff information to assist future FLMA leave requests and cautioned against violating FMLA procedures. (*Id.*) Lastly, Plaintiff met with her former supervisor, Mark Fortkamp, in person to discuss her issues with Westbrooks and the previous day's drama. (*Id.* at 89.)

---

[2] Westbrooks disputes leaving work and making this alleged comment.
[3] Sheward documented the conversation in an e-mail to Fortkamp and Westbrooks. (Doc. 84-1 at 84.)

Another disputed incident kicked off at 10:45 a.m. on August 10, 2015 when Plaintiff requested FMLA leave from Westbrooks by leaving a time slip and sending a calendar invite in a brief email that said simply: "I need to take a FMLA day today; I tried to stay as long as I could to get things done." (Doc. 77-1 at 100.) Responding to this unspecific request, Westbrooks asked Plaintiff to wait and speak with HR before departing. (SOF ¶ 35.) Plaintiff maintains HR approved her departure. Acting on that alleged approval, Plaintiff departed work and sought treatment for a "sudden respiratory attack" at a local Urgent Care facility. (Doc. 84-1 at 5-6.) An email from City HR representative Vicki Moss memorializing that conversation seems to undermine Plaintiff's statement that she received approval: "[P]lease provide your updated Medical documentation for your condition. Until I have the information, I cannot approve the FMLA for today's absence." (Doc. 77-2 at 90.) The City had previously approved Plaintiff's FMLA leave for specific purposes—hour-long, weekly allergy injections, (SOF ¶ 28), post-operative recovery for carpal tunnel surgery, (SOF ¶ 30), and three of her husband's medical conditions, (SOF ¶¶ 27, 29, 31)—but never for a personal respiratory condition. Over the next several days, HR repeatedly contacted Plaintiff for the medical verification required to approve her August 10 FMLA leave request. (SOF ¶ 37.) On November 15, 2015, having received the requested documentation, the City approved Plaintiff's leave request, (SOF ¶¶ 37-38; ASOF ¶¶ 37-38), marking the first and only approval for intermittent leave related to Plaintiff's respiratory conditions. (*See* Doc. 77-2 at 97-98.)

### b.  Memo of Expectations

The incident on August 10 prompted Westbrooks, with the assistance of HR, to issue a Memo of Expectations (MOE) to Plaintiff. (*Id.* at 257.) Issued on September 14, 2015, the MOE outlined the proper notification procedures for use of FMLA leave and covered absences.[4] (Doc. 84-1 at 257-60.) Among other things, it specified that FMLA leave required a City employee provide their Supervisor as much notice as possible prior

---

[4] On at least two previous occasions the City provided Plaintiff this information—through an HR e-mail on September 30, 2013 and a discussion with HR on January 5, 2015. (Doc. 84-1 at 84.)

to taking the leave, report the status of their condition and intent to return to work, and provide HR with a work release from their health care provider. (*Id.* at 258.) To Plaintiff, the MOE represents one of many incidents of harassment, discrimination, and retaliation.

### c. Additional Conduct

Plaintiff's growing complaints of mistreatment first emerge in her communications with Fortkamp and HR. (*See* Doc. 84-1 at 95-103.) Three incidents stand out: a January 26 meeting with Fortkamp, wherein Plaintiff requested transfer from the Wastewater Division, complaining that she was intimidated by Westbrooks, who treated her unfairly and often raised his voice; (*id.* at 95); a March 3 interaction where Plaintiff complained to Sheward that Westbrooks had learned of her report to HR and issued a warning to not "make this personal" and allegedly refused to approve her FMLA leave (*id.*); and an April 29 communication to Sheward reporting that Westbrooks complaints over the manner and frequency of Plaintiff's breaks from work (*id.* at 100) caused Plaintiff stress and (possibly) ongoing stomach aches and a urinary tract infection. (*Id.*) The reports were not completely one-sided. Plaintiff also reported that Westbrooks had admittedly "gotten better," stopped yelling, and Plaintiff was, as a result, less intimidated than in the past. (*Id.*) But still, Plaintiff saw discrimination: "[H]e doesn't treat the men in this manner, never in my history have I seen him do it them." (*Id.*) On each occasion Plaintiff raised complaints, the responding City employee documented and reported them. (*See id.* at 98, 100.) And often, noting the seriousness of her accusations and emphasizing that discrimination would not be tolerated, they encouraged Plaintiff to file a formal complaint with HR. (*Id.* at 98.)

Second, Plaintiff claims that Westbrooks reduced her lunch break to thirty minutes while allowing the men in her division up to an hour and a half. (Doc. 55 at 4; ASOF ¶ 85.) In an e-mail to Sheward on June 1, 2015, Plaintiff said that after initially giving all his employees an hour for lunch Westbrooks gradually reduced her break to forty-five minutes and then thirty minutes. (*Id.* at 169.) While Westbrooks admits that longer lunches may have occurred when he joined his employees, (*id.* at 19), both Fortkamp and Westbrooks separately insist that a standard thirty-minute lunch is City policy. (Doc. 77-1 at 7, 11.)

Third, Plaintiff cites the removal of the "update," "delete," and "undo" functionalities in her Hansen software on December 17, 2015 as additional evidence of the City's discrimination. (Doc. 55 at 5; Doc. 84-1 at 6.) Observing that other coworkers retained those capabilities, Plaintiff believes she was singled out—the only City employee deprived of the software functions. Defendants flatly reject that characterization and offer a different explanation. The City's Enterprise Asset Manager, Marcella Maulfair, testified that all field workers, leads, supervisors and software inputters like Plaintiff lost the "delete" button to ensure work orders would not be erroneously deleted. (Doc. 84-1 at 6; Doc. 77-3 at 40.) The City removed Plaintiff's "update" button not as punishment or retaliation, but because it was "not part of [Plaintiff's] job duties anymore." (Doc. 84-1 at 278.) Coworkers who retained that functionality did so only temporarily to facilitate a new employee's training. (*See id.*)

Fourth, Plaintiff points to complaints regarding her workplace's unisex restroom. With no City policy requiring both male and female bathrooms, Plaintiff's workplace, known as the Warehouse, had a male and unisex restroom. (Doc. 77-1 at 7 and 11; Doc. 77-3 at 42.) Allegedly, both Westbrooks and male coworkers used the women's restroom and left it dirty. (Doc. 55 at 4; Doc. 84-1 at 95.) As a courtesy to Plaintiff, Fortkamp "explained to staff to use the [male] bathroom for primary use and to use the unisex one if the primary one was occupied." (*Id.*)

Fifth, and lastly, Plaintiff alleges that Westbrooks mocked her on several occasions: for her use of FLMA leave, (Doc. 55 at 4 (calling her a "'big baby' for needing to use FMLA")); for her subpar work ethic and excessive breaks, (*id.* (commenting that he "d[id]n't hear those [keyboard] keys," when Plaintiff would take and taking public note whenever Plaintiff used the restroom); and for her ongoing respiratory issues, (*id.* (comparing Plaintiff's condition to his wife's breathing difficulties during sexual intercourse)). Westbrooks uniformly denies such comments, which no other City employee corroborates. (*See* Doc. 84-1 at 29, 31.)

### d. City Policy and Human Resources Investigation

1  After continued conversations with and encouragement from HR, Plaintiff filed a

2  formal investigation request with HR on May 12, 2015. (*Id.* at 107.) The City's Workplace

3  Harassment policy mandates that once filed, "the Human Resources Director shall

4  expediently direct the department head to investigate complaints of prohibited

5  harassment," (Doc. 77-3 at 58), because the City "prohibits conduct which creates an

6  intimidating, hostile, or offensive work environment." (*Id.* at 55.) Once an investigation

7  concludes, disciplinary action "shall be taken depending on the circumstances and

8  variables of each individual situation."[5] (*Id.* at 58-59.)

9  Two days after Plaintiff filed her complaint, HR initiated an investigation,

10  interviewing Plaintiff, Westbrooks, and four other City employees. (Doc. 84-1 at 114; Doc.

11  77-1 at 67-71.) HR did not find in Plaintiff's favor. (Doc. 77-1 at 67-71.) Despite sharing

12  a workspace with Plaintiff in the Warehouse, no other City employee corroborated

13  Plaintiff's harassment and discrimination claims, (*Id.* at 79-91; Doc. 84-1 at 172-77), or

14  even overhead Westbrooks disparage or harass Plaintiff. (Doc. 77-1 at 79-91; Doc. 84-1 at

15  172-77.)  The interviews did, however, reveal widespread concerns over Plaintiff's work

16  ethic. Three employees attested that regularly Plaintiff texted, made personal phone calls,

17  and constantly scrolled through Facebook while at work. (Doc. 77-1 at 69-80.) One went

18  so far to say that Plaintiff "told me I [was] there to be her assistant when she falls behind"

19  and to do her work while Plaintiff used Facebook. (*Id.* at 79-80.) A former supervisor,

20  however, was more laudatory, commenting that Plaintiff "had been a workhorse." (Doc.

21  84-1 at 176.) HR delivered the findings to Plaintiff on July 15, 2015 and explained that

22  while his conduct did not rise to the level of sexual harassment, Westbrooks had acted in

23  an inappropriate manner "unbecoming of a city employee." (Doc. 84-1 at 185.) The City

24  did not explain what specific conduct it found "unbecoming," but emphasized that "the

25  appropriate level of action will be taken" and encouraged Plaintiff to report any perceived

26  instances of retaliation. (*Id.*)

27

28  _____

[5] The City requires all employees complete training on appropriate workplace conduct and the procedures to report possible workplace harassment. (Doc. 77-3 at 55-64.) Westbrooks received this training. (*Id.* at 65.)

### e. Annual Performance Reviews

City employees receive annual performance reviews from their supervisors in May of every year. (*Id.* at 134-64.) In such reviews, supervisors' comment on and rate employee performance in several categories, assigning one of four scores: (1) "Does Not Meet," (2) "Improvement Needed," (3) "Meets Expectations" and (4) "Above Expectations." (*Id.* at 134-64) Westbrooks, who reviewed Plaintiff's performance from 2012 to 2015, gave Plaintiff her most negative review in 2015. (*Id.*) While receiving "Above Expectations" in two categories and "Meets Expectations" in the remaining seven graded categories in 2014, Plaintiffs 2015 scores dropped. (*Id.* at 134-39.) In 2015, she received "Improvement Needed" in four categories and "Meets Expectations" in the other six graded categories.[6] (*Id.* at 143-47.) Worse still were Westbrooks' comments on her performance in 2015 which emphasized that Plaintiff misappropriated City time for personal business, took excessive breaks, and had a spotty attendance record.[7] Plaintiff's 2014 review shared only one of these critiques—an "excessive misuse of City time" for personal business. (*Id.* at 138-39, 147.)

### C. Procedural Background

Plaintiff submitted her letter of resignation to HR on December 21, 2015 effective January 1, 2015. (Doc. 77-1 at 111.) Nearly a year later, Plaintiff initiated a discrimination claim with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 55-1 at 2.) The EEOC issued their findings and a Notice of Right to Sue letter to Plaintiff on September 24, 2017, in which they were "unable to conclude that the information obtained establishes violations of the statutes." (*Id.* at 5.) On December 12, 2017, Plaintiff initiated the instant action, filing suit against Defendants. Her third amended complaint alleges (1)

---

[6] Plaintiff's 2012 and 2013 reviews were also better than her 2015 review, receiving "Meets Expectations" in all nine graded categories despite consistent concerns over a spotty attendance record. (Doc. 84-1 at 149-64.)

[7] Far from the first occasion where Plaintiff received similar feedback, Westbrooks had previously "counseled" Plaintiff on her failure to comply with FMLA procedures and attendance issues. (Doc. 84-1 at 77, 182, 262-65, 269.) Although he acknowledged in deposition that he did not document every conversation with Plaintiff about her work performance, (Doc. 84-1 at 17-20), Westbrooks maintains he consistently counseled Plaintiff for excessive breaks and use of work time at work to conduct personal business. (Doc. 84-1 at 17-20; Doc. 77-1 at 9, 19.)

violation of her rights and retaliation under the FMLA; (2) sex discrimination and retaliation under Title VII; and (3) discrimination and retaliation under the ADA. (Doc. 55 at 6-9.)

## II.     LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is any factual issue that might affect the outcome of the case under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.*  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  The court need only consider the cited materials, but it may also consider any other materials in the record.  *Id.* 56(c)(3).  Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 1056 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  If the movant fails to carry its initial burden, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  If the movant meets its initial responsibility, the burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact.  *Id.* at 1103.  The nonmovant need not establish a material issue of fact conclusively in its favor, but it "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  The nonmovant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment.  *Liberty Lobby*, 477 U.S. at 247–48, 106 S.Ct. 2505.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249–50 (citations omitted).  However, in the summary judgment context, the Court believes the nonmovant's evidence, *id.* at 255, and construes all disputed facts in the light most favorable to the nonmoving party, *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

## III.   DISCUSSION

Defendants seek summary judgement on all claims because there are no genuine issues of material fact and under those facts, Plaintiff's claims fail.  Apart from Plaintiff's various retaliation claims, the Court agrees and, for the reasons that follow, will grant summary judgment in part.

### A.   **FMLA Claims**

The Family and Medical Leave Act ("FMLA" or "the Act"), 29 U.S.C. 2601(b), et seq., allows eligible employees to take up to twelve work weeks of unpaid leave annually for qualified reasons, including the onset of serious health conditions. *See Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 724 (2003) (quoting 107 Stat. 9, 29 U.S.C. § 2612(a)(1)(C)). The FMLA's purpose is to "balance the demands of the workplace with the needs of families." 29 U.S.C.A § 2601. To effectuate this objective, the FMLA prohibits employers from interfering with "the exercise of or the attempt to exercise the substantive rights guaranteed by FMLA." *Bachelder Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001) (quoting 29 U.S.C § 2615(a)(1)). An employer's violation of employee rights under the FMLA "creates a private right of action to seek both equitable relief and money damages against any employer (including a public agency) in any Federal or State court of competent jurisdiction." *Id.* (citing 29 U.S.C. § 2617(a)(2)).  Plaintiff

claims that Defendants interfered with her use of the FMLA, (Doc. 55, "Count I"), and later retaliated against her for exercising her FMLA rights, (*id.*, Count II).[8]

### a.  Count I: FMLA Interference

A prima facie case for a FMLA interference claim requires a plaintiff show "(1) she was eligible for FMLA protection, (2) her employer was covered by the FMLA, (3) she was entitled to take leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled." *Escriba v Foster Poultry Farms Inc*., 743 F.3d 1236, 1243 (9th Cir. 2014). In that analysis, an "employer's intent is irrelevant to a determination of liability." *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011). Plaintiff satisfies the first four elements but does not show that Defendants' alleged discouragement of Plaintiff's use of FMLA leave satisfies the requirements of prima facie FLMA interference claim.

### i.  Plaintiff Provided Adequate Notice

When requesting leave under the FMLA, an employee must provide an employer "sufficient notice of her intent to take leave." *Sanders*, 657 F.3d at 778. Arguing that notice was adequate because her need was emergent and unforeseeable, Plaintiff correctly looks to Department of Labor regulations outlining "[e]mployee notice requirements for unforeseeable FMLA leave." (*See* Resp. at 6 (citing 29 C.F.R. § 825.303.)[9] The requirements are straightforward, and Plaintiff meets them.

---

[8] Plaintiff dedicates a paragraph to ask this Court to follow the Second Circuit in *Graziadio v. Culinary Inst. of America*, 817 F.3d 415, 422 (2nd Cir., 2016) and expand the definition of "employer" under the FMLA along similar lines as it is "highly likely the Ninth Circuit will eventually follow suit." (Resp. at 6.) From there, and with no further analysis, Plaintiff baldly concludes that Westbrooks fits that definition which automatically renders his individual liability a question for the jury. (*Id.*) Plaintiff supports this conclusion with no legal analysis and makes no attempt to apply a single fact to otherwise bare recitations of legal standards. The Court thus refrains from entertaining this argument.

[9] Defendants seemingly fail to grasp the import of the distinction between notice requirements for foreseeable and unforeseeable FMLA leave and offer no argument on the point, thus conceding that Plaintiff's need was unforeseeable. *Compare* 29 C.F.R. § 825.302 *with* 29 C.F.R. § 825.303.

First, the timing of Plaintiff's notice is satisfactory. When the need for leave is not known in advance, an employee should give notice to the employer of the need for FMLA leave "as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). Before leaving work to seek treatment, Plaintiff emailed her supervisor, sent him a calendar invite, and filled out a leave slip. (Doc. 77-1 at 100.) When confronted by Westbrooks and asked to contact HR for further approval, Plaintiff complied. Defendants do not dispute that Plaintiff's reason, a sudden respiratory attack, was an FMLA-qualifying reason. And while Westbrooks, and the City by proxy, may take issue with Plaintiff's decision to leave the workplace before they granted formal approval, Plaintiff's actions constitute notice.

Second, given the arguably emergent circumstances, the notice satisfactorily complied with the City's procedural requirements. That is, while employees are generally required to comply with an employer's customary notice and procedural requirements for foreseeable leave requests, "in the case of an emergency requiring leave because of a FMLA-qualifying reason," not even "written advanced notice pursuant to an employer's internal rules and procedures" is necessarily required. 29 C.F.R. § 825.303(c). Plaintiff provided written and verbal notice prior to taking unforeseeable leave and responded to the City's inquiries after receiving treatment.

And lastly, while it is true that an employer is "*expected* to obtain any additional required information . . . to determine whether an absence is potentially FMLA–qualifying," Plaintiff met that requirement as well. C.F.R. § 825.303(b) (emphasis added). Inadequate response to such employer requests *can* carry consequences. The "[f]ailure to respond to reasonable employer inquiries regarding the leave request may result in denial of FMLA protection if the employer is unable to determine whether the leave is FMLA–qualifying." *Id.* Here, Plaintiff complied and, notably, the City approved.

### ii. Plaintiff Cannot Show Defendants Actively Discouraged Her Use of FLMA Leave to Establish Interference Within the Act's Meaning

The fifth and final element of a prima facie FMLA interference claim requires Plaintiff establish that Defendants denied "FMLA benefits to which she was entitled." *Escriba*, 743 F.3d at 1243. Although Plaintiff concedes that on every occasion she sought formal approval for FMLA leave, the City approved her request, (SOF Ᵽ 24; CSOF Ᵽ 24), the absence of a formal denial of FMLA leave is not determinative. That is, an employer interferes with an employee's rights under FMLA "not only [by] refusing to authorize FMLA leave" but by "discouraging an employee from using such leave." 29 C.F.R. §825.220(b); *see also Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1134 (9th Cir. 2003). Thus, the deterrent effect of employer's conduct can discourage the use of the FMLA sufficiently to constitute interference within the meaning of the FMLA. This is not one such instance and Plaintiff's arguments do not persuade.

With no explicit denial of FMLA leave to point to, Plaintiff's FMLA interference claim turns on whether the instances of alleged discouragement amount to denial of FMLA benefits to which she was entitled. *Escriba*, 743 F.3d at 1243. Plaintiff cites a litany of Defendants' conduct to substantiate her claims of discouragement, (ASOF ¶¶ 85-89; 117-125),[10] but provides insufficient support to establish interference within the meaning of the FMLA. Plaintiff's argument fails for three reasons. First, it is largely speculative. That is, Plaintiff's argument relies in large part on speculation, inference, and a self-serving affidavit to connect otherwise unrelated workplace conduct to the conditions for which Plaintiff sought FMLA leave. (*See* CSOF ⱣⱣ 87-89; Doc. 84-1 at 29, 107.) While there is little doubt, as the City acknowledged, (SOF Ᵽ 17), that Westbrooks' conduct at times bordered on unprofessional, there is little to connect that conduct to Plaintiff's FMLA leave requests. Instead, the conduct largely documents wholly inappropriate critiques of Plaintiff's use of work time and job performance. (CSOF ⱣⱣ 69, 85.) On only a few occasions does Plaintiff support her self-serving attestations with citation to the record.

_____

[10] Plaintiff's response incorrectly cites a nonexistent range of paragraphs: ASOF ¶ 117-1255. (*See* Resp. at 5.)

And notably, on one the few instances she does, the evidence does not support her conclusion. Even where Westbrooks counsels Plaintiff regarding possible misuse of "sick" leave, he expresses concern with the timing, not the type of leave. (CSOF ⁋ 86.) Thus, outside of generally feeling ill at-ease with Westbrooks, Plaintiff does not show how he interfered with her ability to use FMLA, nor does she provide case law to substantiate this argument. (*See* Doc. 55 at 6 and Resp. at 3-7.)

Second, Plaintiff fails to show that the delays she experienced on January 5, 2015 or August 10, 2015 amounted to discouragement and certainly not denial. (*See* ASOF ¶¶ 85-89; 117-125.) Defendants, on both occasions, sought clarifying information to understand Plaintiff's medical condition in order to assess, among other things, whether Plaintiff requested leave for an FMLA-qualifying reason. (*See* Doc. 84-1 at 79-82, 195-197; Doc. 77-1 at 100-109.) While Plaintiff's actions to seek clarification on January 5 resulted in delay, employers are, as discussed, well within their statutory rights to request information to validate that an employee requested leave for an FMLA-qualifying reason. *See* 29 C.F.R. § 825.208(a)(1), (2). As Plaintiff did not have previously established FMLA leave for the respiratory conditions she complained of on either day, Defendants compliance with their duties under the Act alone cannot qualify as the type, nor reach the level, of discouragement to satisfy a prima facie interference claim. *See Bailey v. Sw. Gas Co.,* 275 F.3d 1181, 1186 (9th Cir. 2002) (rejecting FMLA interference claim where plaintiff did not fill out required medical forms in full). Ultimately, Plaintiff asks the Court to find that her self-serving and uncorroborated reports of her direct supervisor's inappropriate tone and facially unrelated misconduct equates to "interfer[ence] with the length and dates of leave, including denying leave out right." *Xin Liu v. Amway Corp.,* 347 F.3d at 1134. More is required. *See e.g., Valtierra v. Medtronic Inc.,* 232 F. Supp. 3d 1117, 1128 (D. Ariz. 2017). And "conclusory, self-serving affidavit[s], lacking detailed facts and any supporting evidence" are "insufficient to create a genuine issue of material fact." *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n. 2 (9th Cir. 2007) (internal quotation marks

and citation omitted). Thus, the Court does not find that Defendants interfered with Plaintiff's FMLA rights.

### b. Count II: FMLA Retaliation

In addition to prohibiting interference with FMLA rights, the Act makes it unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C § 2615(a)(2). Although the Ninth Circuit has yet to address what a plaintiff must show to establish a discrimination claim under § 2615(a)(2), *see Bachelder*, 259 F.3d at 1125 n.11 (declining to consider "[w]hether or not the *McDonnell Douglas* anti-discrimination approach is applicable in cases involving the 'anti-retaliation' provisions of FMLA"), the parties both apply the *McDonnell Douglas* framework. *See Douglas v. Dreamdealers USA, LLC*, 416 F.Supp.3d 1063, 1075 (D. Nev. 2019) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Accordingly, to establish a prima facie case of retaliation under § 2615(a)(2), a plaintiff must establish she: (1) engaged in a protected activity under the FMLA; (2) suffered some adverse employment action by the employer following the protected activity; and (3) the adverse employment action was causally linked to the protected activity." *Douglas*, 416 F. Supp. 3d at 1075 (quoting *Browett v. City of Reno*, 237 F. Supp. 3d 1040, 1046 (D. Nev. 2017)). Once established, the burden shifts. The defendant must articulate "a legitimate, nondiscriminatory reason for the adverse employment action." *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 849 (9th Cir. 2004). That satisfied, the plaintiff must show that the given reason is pretextual, *id.*, in two ways: "(1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir. 2002) (internal quotation marks omitted).

### i. Plaintiff's Prima Facie for FMLA Retaliation

#### 1. Plaintiff Engaged in a Protected Activity

- 15 -

Plaintiff argues she engaged in a protected activity by "opposing Defendants violation of her FMLA rights on multiple occasions," (Doc. 55 at 7), specifically by reporting her complaints with Westbrooks' hostility towards FMLA leave to Fortkamp. (*See also* Resp. at 10.)   Exercise of Plaintiff's intermittent FMLA leave undoubtedly constitutes protected activity. (*See* Doc 77-2 at 56); *see also Cheeks v. Gen. Dynamics*, 22 F.Supp.3d 1015, 1041 (D. Ariz. 2014) (finding plaintiff engaged in a protected activity by using her intermittent FMLA leave every Friday). So does filing informal complaints over alleged discriminatory behavior. *See Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 506 (9th Cir. 2000) (allowing retaliation claim based on informal complaints of allegedly discriminatory conduct). Construing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff's documented complaints to Fortkamp and HR about her struggles to use FMLA leave constitutes a protected activity. (*See e.g.,* Doc. 84-1 at 89, 95, 98.)

## 2.   Adverse Employment Actions

Under the FMLA, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c). Adverse employment actions are those that "materially affect the compensation, terms, conditions, or privileges of the [ ] employment." *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1126 (9th Cir. 2000) (failure to inform plaintiff of internal findings or disciplinary actions regarding employee was not an adverse employment action in a Title VII case); *see also Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987) (determining "[t]ransfers of job duties and undeserved performance ratings, if proven, would constitute adverse employment decisions") (internal citations omitted). The Ninth Circuit's grasp of adverse employment actions is broad: "[a]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000).

- 16 -

Of the cited facts Plaintiff believes qualify as adverse employment actions, a few stand out and constitute adverse employment actions: the removal of key functions from Hansen, Plaintiff's 2015 performance review, and the MOE which Plaintiff describes as a "warning of termination." (Resp at 10; *see also* Doc. 55 at 7.) It is likely that this conduct, if causally connected to a protected activity, would be reasonably likely to deter an employee from engaging in that activity. *See Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (9th Cir. 1987).

1. Temporal Proximity Establishes a Causal Connection

The temporal proximity between the adverse employment actions and Plaintiff's intermittent reports to HR and Fortkamp establishes a causal connection under the *McDonnell Douglas* framework. That is because such temporal proximity alone between can "constitute sufficient circumstantial evidence of retaliation in some cases." *Bell v. Clackamas Cnty*, 341 F.3d 858, 1054 (9th Cir. 2003) (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("[C]ausation can be inferred from timing alone where an adverse action follows on the heels of protected activity."). The time between the activities that courts deem enough varies. *See e.g., Bell*, 341 F.3d at 865-66 (approximately six-month gap); *Yartzoff*, 809 F.2d at 1376 (less than three months); *but see Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (timing alone insufficient to support retaliation claim when two years had passed before the alleged adverse employment action). But as Plaintiff sets forth: "The timeframe deemed sufficiently 'close' by the Ninth Circuit for temporal proximity to support an inference of causation—without more—appears to be anywhere from four days (or less) to two months." (Resp. at 8.)

Here, Plaintiff's protected activity took place with enough temporal proximity to by itself establish a causal connection, but not in every case. The three examples fit the acceptable timeframe. The City issued the MOE on September 14, 2015, (Doc. 77-1 at

106), and modified Plaintiff's Hansen software functions on October 1, 2015, (Doc. 84-1 at 278). Both adverse actions took place within two months of Plaintiff's August 10 FMLA leave request. Although slightly more extenuated,[11] Plaintiff's May 26, 2015 performance review likewise fits.

### ii.   Defendants' Legitimate, Non-Discriminatory Reasons

With a prima facie case established, the burden shifts to Defendants to produce evidence that the adverse employment actions were taken for legitimate, nondiscriminatory reasons. *See Douglas*, 656 F.2d at 533. At this stage, employer's burden is "one of production, not persuasion, thereby involving no credibility assessment." *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1148-49 (9th Cir. 2006) (citation omitted); *see also Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1098, 67 L.Ed.2d 207 (1981). That is to say "the employer need not persuade the court that it was actually motivated by the proffered reasons: 'It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Yartzoff*, 809 F.2d at 1376 (quoting *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1098). Defendants clearly meet that standard. The MOE—omitted entirely from the Third Amended Complaint, (Doc. 55), and only raised in Plaintiff's response—sets forth legitimate, nondiscriminatory reasons itself, explaining the City's dissatisfaction with Plaintiff's communication surrounding her August 10, 2015 FMLA leave request and outlining the proper procedures to avoid conflict in future requests. (*See* Doc. 77-1 at 106-109.) That the City removed certain Hansen software functionalities from a range of City employees in order to "prohibit erasure of work order histories and preserve public records" is well established in the record. (MSJ at 8 (citing SOF ⁋ 46).) The record establishes widespread, nondiscriminatory removal of Hansen functions. (Doc. 84-1 at 6; Doc. 77-3 at 40.) What's

---

[11] Nearly three months (eighty-seven days) passed between Plaintiff's alleged protected activities and the release of Plaintiff's 2015 performance review on May 26, 2015.[11] (CSOF ⁋ 106.)

more, the decision to remove Hansen software functions was made by managers with no other evident connection to Plaintiff or the conduct giving rise to her claims.

### iii.    Pretext

Plaintiff offers no direct evidence showing that unlawful discrimination more likely motivated Defendants, nor does her indirect evidence make evident that Defendants' proffered legitimate, nondiscriminatory explanations are "inconsistent or otherwise not believable." *See Lyons*, 307 F.3d at 1113. That said, the record establishes that Plaintiff's pre-2015 performance reviews were mostly positive, contains some evidence of credible job performance, and reveals some degree of animus on Westbrooks' part. Additionally, the temporal proximity of Plaintiff's protected activity and the adverse employment actions further supports that the finder of fact is best suited to determine whether Defendants' legitimate, nondiscriminatory reasons are pretextual. *See Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995). And although this is a close case, "[s]uch uncertainty at the summary judgment stage must be resolved in favor of the plaintiff." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004).   The above evidence is not overwhelming, but the Court cannot conclude that no reasonable jury could find retaliation. Accordingly, the Court will deny summary judgment on Plaintiff's FMLA retaliation claims.

### B.  Title VII Claims

Plaintiff raises both a discrimination and retaliation claim under Title VII of the Civil Rights Act of 1964 ("Title VII").

### a.    Count III: Sex Discrimination under Title VII

Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits employers from discriminating against an employee based on race, color, religion, sex, or national origin.[12] 42 U.S.C. § 2000e-2. Section 703(a) specifically "forbids an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with

---

[12] Various forms of discrimination are actionable under Title VII, including hostile work environment and disparate treatment. *See generally Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (quoting 42 U.S.C. § 2000e–2(a)(1) (internal citations and quotations omitted). Plaintiff alleges that the City "violated Title VII by engaging in direct sexual harassment and disparate treatment of Plaintiff because of her sex" and "by creating . . . a hostile work environment that altered the terms and conditions of Plaintiff's employment." (Doc. 55 at 7.) As discussed below, each claim fails.[13]

### i.   No Tangible Employment Action

Title VII guarantees employees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor*, 477 U.S. at 65. Employers are vicariously liable to a "victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). One category of employer conduct automatically imposes liability under Title VII: "When an employee has been subjected to an unlawful 'tangible employment action' by a supervisor, the employer may be held liable without more." *Holly D. v. California Institute of Technology*, 339 F.3d 1158, 1167 (9th Cir. 2003) (citing *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257). Conversely, "when the employee has been unlawfully harassed, but there has been no 'tangible employment action,' the employer may avoid liability by proving the defense of 'reasonable care.'" *Id.* Significant changes in employment status like "discharge, demotion, or undesirable reassignment" constitute tangible employment actions. *Id.* at 744. Plaintiff suffered no

---

[13] Neither the City nor Plaintiff specifically address the sexual harassment or disparate treatment theories in their motions. (See Mot. at 8-13; Resp. at 10-1; Rep. at 5-6.) The Court therefore only analyzes Plaintiff's claim under the hostile work environment theory in depth, but notes that, as with Plaintiff's FMLA retaliation claim, *see supra* pages 17-21, Plaintiff's sexual harassment and disparate treatment theories rely entirely on speculation and Plaintiff's self-serving testimony and fail to establish a genuine issue of material fact. *See Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("When reading [the plaintiff's] brief, one wonders if [the plaintiff], in its own version of the 'spaghetti approach,' has heaved the entire contents of a pot against the wall in hopes that something would stick. We decline, however, to sort through the noodles in search of [the plaintiff's] claim.").

action of like kind. She does not now argue, nor does the record support,[14] that the City's actions constituted a tangible employment action.

### ii. Plaintiff's Prima Facie Hostile Work Environment Claim

To establish a prima facie hostile work environment claim under Title VII, Plaintiff must show: (1) that she was subjected to verbal or physical conduct of a harassing nature; (2) that this conduct was unwelcome; and (3) that, because of her sex, she was subjected to unwelcome conduct that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017); *see also Pavon v. Swift Trans. Co., Inc.,* 192 F.3d 902, 908 (9th Cir. 1999) (citing *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399). The work environment must be both subjectively and objectively perceived as abusive and evaluated by considering the totality of the circumstances. *Fuller*, 865 F.3d at 1161.  Importantly, "[t]he conduct must constitute discrimination because of sex." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

Though support in the record is thin, and there is no indication this conduct was "physically threatening," its frequency is concerning. While "'simple teasing, offhand comments, and isolated incidents (unless extremely serious)' are not sufficient to create an actionable claim under Title VII . . . harassment need not be so severe as to cause diagnosed psychological injury." *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 687 (9th Cir. 2017) (alteration omitted) (quoting *Faragher*, 524 U.S. at 788). Accordingly, the record supports that the alleged conduct was sufficiently severe or pervasive as to alter the conditions of Plaintiff's employment. "It is enough 'if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work,

---

[14] Plaintiff resigned and affirmatively changed her employment status. She was not involuntarily discharged, demoted, or reassigned.

and to desire to stay in her position.'" *Id.* (quoting *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994)). Throughout 2015, Plaintiff consistently expressed her personal struggles with Westbrooks' supervision, but the record gives little indication that any alleged discrimination was due to Plaintiff's sex. In some ways, the record supports the opposite conclusion. Co-workers corroborated some disparate treatment of Plaintiff: Westbrooks was "rougher and more direct with the guys." (Doc. 77-1 at 70.) That said, given that Plaintiff was the only woman under Westbrooks' supervision, a reasonable woman may have also attributed such consistent harassment to her sex. *See Davis*, 520 F.3d at 1095.

### iii.    The City Establishes an Affirmative Defense

Recognizing that they took no tangible employment action, the City raises an affirmative defense. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 807 (1998). The defense is two-fold: the City must show: (1) "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior;" and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765 (1998); *see also Montero v. AGCO Corp.*, 192 F.3d 856, 864 (9th Cir. 1999) (finding the defendant's dissemination and use of a sensible sexual harassment policy that plaintiff was aware of satisfied the affirmative defense). The measure of an employer's reasonable care "is not whether any additional steps or measures would have been reasonable if employed, but whether the employer's actions as a whole established a reasonable mechanism for prevention and correction." *Holly D. v. California Inst. of Tech.*, 339 F.3d 1158, 1177 (9th Cir. 2003). The second prong of the affirmative defense is to ensure a victim uses "such means as are reasonable under the circumstances to avoid or minimize the damages' that result from violations of the statute." *Faragher*, 524 U.S. at 806, 118 S.Ct. 2275 (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219 (1982)).

As an initial matter, Plaintiff response leaves the City's affirmative defense arguments untouched. What Plaintiff fails to contest she concedes. *See Buggs v. Powell*, 293 F.Supp.2d 135, 141 (D.D.C. 2003) (concluding that the court may treat as conceded arguments raised in a dispositive motion that the plaintiff fails to address in opposition). This failure is by itself fatal to Plaintiff's Title VII discrimination claim and, regardless, the City succeeds on the argument's merits. As discussed below, the record supports that the City exercised reasonable care by adhering to established sexual harassment policies, while Plaintiff unreasonably failed to make use of the preventive and corrective opportunities at hand.

       1.   <u>The City Implemented and Adhered to Policies</u>

By initiating an investigation two days after Plaintiff's request, the City adhered to an existing anti-harassment policy and exercised reasonable care. *See Holly D.*, 339 F.3d at 1178 (finding no dispute of material fact that employer exercised reasonable care where investigation was prompt and reasonable). First, the City had a policy in place during the relevant time period. (Doc. 77-3 at 55-63); *Faragher*, 524 U.S. at 807 ("While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense."). Second, the policy defines sexual harassment, identifies procedures to report complaints, describes the range of disciplinary measures at the City's disposal, and admonishes retaliation. (SOF ⁋ 52); *see also Montero v. AGCO Corp.*, 192 F.3d 856, 862 (9th Cir. 1999). Third, the City also trains employees to prevent such harassment. (SOF ⁋ 54.) Upon filing a formal complaint, the City interviewed co-workers and City employees with experience with both Plaintiff and Westbrooks in a formal investigation. (Doc 77-3 at 58, 79-91; Doc. 84-1 at 172-77.) That the City investigation complied with the City policy is facially apparent—Westbrooks was reprimanded for unbecoming conduct and, despite finding no support for Plaintiff's sexual harassment

claims, the City compelled him to complete remedial harassment training. (Doc 77-3 at 65.) The City's reasonable care is evident in the dissemination and implementation of their harassment policy, satisfying the first prong of the *Faragher* affirmative defense.

2.   Plaintiff Unreasonably Availed Herself to the City's Policies

The City also satisfies the second prong. Despite regular encouragement and assistance from HR, Fortkamp, and, at times, Westbrooks, Plaintiff passed on numerous opportunities to avail herself to the City's internal remedies. Prior to the filing a formal complaint, the record's first indication of a sexual harassment complaint by Plaintiff came in the January 26, 2015 conversation with Fortkamp. (Doc 84-1 at 89.) In March, HR strongly encouraged Plaintiff to file a formal report, emphasizing the seriousness of her sexual harassment allegations. (Doc 84-1 at 98.) It was not until May 12, 2015, two months later, that Plaintiff did so. And after the City shared its findings which did not corroborate the allegations against Westbrooks, Plaintiff took no further action. Plaintiff did not challenge the outcome and, despite the City's continued encouragement, made no further complaints of sexual discrimination or retaliation. (*See* Doc. 84-1 at 184-85.) Aside from arguing that the City never provided Plaintiff a physical copy of the internal investigation report, Plaintiff does not proffer a determinative reason why she did not avail herself of further procedural remedies. *See Holly D*, 339 F.3d at 1178-79. Accordingly, the City establishes an adequate affirmative defense to Plaintiff's hostile work environment claims.

**b.   Count V: Title VII Retaliation**

Title VII also assigns liability for retaliation, which occurs where an employer discriminates "against an employee because that employee 'has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Ray,* 217 F.3d at 1240 (quoting 42 U.S.C. § 2000e–3(a). An employee establishes a prima facie case for Title VII retaliation when the employee shows

1   she engaged in a protected activity, that her employer subjected to an adverse employment
2   action, and that a causal link exists between the protected activity and the adverse action.
3   *Id.*
4           The City concedes that, by filing a sexual harassment complaint, Plaintiff took part
5   in a protected activity but disputes the existence of an adverse employment action. (Mot.
6   at 13.) Plaintiff's Title VII retaliation claim repeats the arguments of her FMLA retaliation
7   claim, citing identical adverse employment actions and case law. (Resp. at 16-17.) That
8   argument, adopting the *McDonnell Douglas* framework and persuasive in the FMLA
9   retaliation context, is also persuasive here. *See Douglas*, 416 F. Supp. 3d at 1075.
10  Plaintiff's Title VII retaliation claim thus survives the summary judgment.

11          **C. <u>ADA Claims</u>**
12          Title I of the Americans with Disabilities Act (the "ADA") provides that no
13  employer "shall discriminate against a qualified individual on the basis of disability in
14  regard to job application procedures, the hiring, advancement, or discharge of employees,
15  employee compensation, job training, and other terms, conditions, and privileges of
16  employment." 42 U.S.C.A. § 12112(a). An employer engages in unlawful discrimination
17  under the ADA by "not making reasonable accommodations to known physical or mental
18  limitations of an otherwise qualified individual with a disability[.]" 42 U.S.C. §
19  12112(b)(5)(A); *see Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018)
20  ("The ADA treats the failure to provide a reasonable accommodation as an act of
21  discrimination if the employee is a qualified individual[.]"). An employer has affirmative
22  duties to engage in an interactive process with a disabled individual to identify reasonable
23  accommodations. *See Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 799 (9th Cir.
24  2017). Failure to do so constitutes unlawful discrimination under the ADA if a reasonable
25  accommodation was possible. *See Snapp*, 889 F.3d at 1095.

26          **a.  Count IV: Plaintiff's ADA Discrimination Claim**

To establish an ADA discrimination claim, a plaintiff must show that (1) she is disabled under the Act; (2) she is a qualified individual in that she can perform the essential functions of her job; and (3) the defendant failed to provide a requested reasonable accommodation, failed to engage in an interactive process to identify a possible reasonable accommodation, or terminated her because of the disability.[15] *See id.*; *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996); *Sanders v. Arnesan Prods., Inc.,* 91 F.3d 1351, 1353 (9th Cir. 1996); *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999); *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1090 (9th Cir. 2002); *Bates v. United Parcel Serv., Inc*., 511 F.3d 974, 988 (9th Cir. 2007).

In turn, the City provides three independent reasons that justify a grant of summary judgment on Plaintiff's ADA claims: (1) Plaintiff is not disabled under the ADA; (2) Plaintiff failed to avail herself of the City's established procedures to grant reasonable accommodations; and (3) Plaintiff "cannot and does not show what reasonable accommodation she requested and did not receive." (Mot. at 14-15.) The Court finds the City's arguments persuasive.

### i. Plaintiff Fails to Establish She is Disabled Under the ADA

The ADA defines disability as: "a physical or mental impairment that substantially limits one or more major life activities;" "a record of such an impairment;" or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). A "major life activity" is "a basic activity that the average person in the general population can perform with little or no difficulty." *McAlindin v. Cty. of San Diego*, 192 F.3d 1226, 1233 (9th Cir. 1999) (internal quotations and citations omitted).  Among other activities, the ADA considers "breathing" one such major life activity. *See* 42 U.S.C. § 12102(2)(A) (listing examples).

---

[15] In the Ninth Circuit, "ADA discrimination claims under Title I must be evaluated under a but-for causation standard" that Plaintiff hardly comes close to satisfying. *Murray v. Mayo Clinic*, 934 F.3d 1101, 1107 (9th Cir. 2019).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff does not specifically identify her alleged disability. While contending she "suffered from stomach issues, including digestive problems, and urinary tract infections, as well as severe allergies and asthma," (Doc. 84-1 at 3) while a City employee, Plaintiff's arguments at oral argument identified "breathing difficulties" as the locus of her ADA claims. The Court thus analyzes Plaintiff's "breathing difficulties" as the claimed disability.  To support her claim of disability, Plaintiff points to an asthma diagnosis and record of formal and informal FMLA requests documenting her respiratory issues. (Resp. at 12.) By itself, an asthma diagnosis does not establish that Plaintiff is disabled within meaning of the ADA. A determination of whether an individual has a disability under the ADA is based on the *effect* of the condition, not the mere fact of diagnosis.  *See* 42 U.S.C. § 12102(1). To qualify as a disability, Plaintiff must establish that asthma "substantially limits" her ability to breath.  *See Gribben v. United Parcel Service, Inc.*, 528 F.3d 1166, 1170-71 (9th Cir. 2008); *see also Service v. Union Pacific R.R. Co.,* 153 F.Supp.2d 1187, 1192 (E.D. Cal. 2001) (considering whether a plaintiff's asthma effected breathing sufficiently to qualify as a disability under the ADA). Because "not every impairment . . . constitute[s] a disability within the meaning of the [ADA]," 29 C.F.R § 1630.2(j), the Court must consider (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. *Gribben*, 528 F.3d at 1170 (quoting 29 C.F.R. § 1630.2(j)(2) (2006).  Merely sporadic episodes of breathing difficulty may not be enough in this analysis. *See Gergen v. City of Kentwood*, No. 1:09-CV-127, 2010 WL 2010878, at *3 (W.D. Mich. May 18, 2010) (listing cases). Here, Plaintiff does not present enough evidence concerning the frequency, duration or severity of her asthma attacks to create a genuine issue of fact that her asthma qualifies as a disability under the ADA. In fact, evidence from Plaintiff's physician describing her asthma attacks as "episodic flare-ups" that occur roughly one to five times per year, aligns with the frequency of Plaintiff's reports of "flare-ups" in the record and undermines her

claim. (*See* Doc. 77-2 at 97-98.) Consequently, Plaintiff fails to establish a prima facie case of discrimination under the ADA, and her claim under § 12112 fails as a matter of law.[16]

### ii.    Plaintiff's Failure to Accommodate Claim Fails

Plaintiff's fails to establish a prima facie ADA discrimination case for additional reasons. Namely, the record does not support that the City failed to accommodate Plaintiff's alleged disability or fail to engage in an interactive process to identify a possible accommodation.

In her communications with the City, Plaintiff never expressly claimed a disability nor formally requested any accommodation to address said disability. (*See* SOF ¶ 77.) Rather, all of Plaintiff's complaints relate to FMLA leave requests or document work environment concerns. But, because the respiratory issues that prompted Plaintiff's FMLA leave requests also form the basis of her disability claims, she contends the City had constructive notice of her disability given her history of FMLA requests. (Doc. 55 at 8.) No formal notice to make explicit that claimed a disability and desired accommodation was required, Plaintiff claims. In her mind, communicating the fact of an underlying condition was enough to shift responsibility to the City. Not so.

It is true that an employer's obligations to engage in an interactive process for finding a reasonable accommodation may be "triggered by an employee . . . giving notice of the employee's disability and the desire for accommodation." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000), *vacated on other grounds sub nom.*, *US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).  But generally, an employer has no duty to provide an accommodation unless one is requested. *See Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1189 (9th Cir. 2001) (holding that "[the employer] had no duty to provide an

---

[16] Although precedent in this circuit supports that a plaintiff's testimony may, in some cases, suffice to establish a genuine issue of material fact, "an affidavit supporting the existence of a disability must not merely be self-serving and must contain sufficient detail to convey the existence of an impairment." *see Head v. Glacier Northwest Inc.*, 413 F.3d 1053, 1058-59 (9th Cir. 2005), *rev'd on other grounds*, *Murray v. Mayo Clinic*, 934 F.3d 1101 (9th Cir. 2019) (citing *TFC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)). Plaintiff's affidavit does not clear that bar.

accommodation for her, given that she never requested one."). And the instances where employee notice triggers those employer responsibilities are somewhat limited, applying "only when the employer (1) knows that the employee has a disability, (2) knows, or has reason to know, that the employee is experiencing workplace problems because of the disability, and (3) knows, or has reason to know, that the disability prevents the employee from requesting a reasonable accommodation." *Brown*, 246 F.3d at 1188 (quotation marks omitted). It is not clear that Plaintiff satisfies any of the above elements. Despite regular communications between the Plaintiff and the City regarding her difficulty with Westbrooks and FMLA leave requests, neither party once mentioned or intimated her "breathing issues" were, or could be, disabling. And, even assuming the City should have interpreted Plaintiff's condition as a disability, it had no reason to assume that disability prevented Plaintiff from requesting a reasonable accommodation. Plaintiff knew how to make such a report—no disability had prevented her regular communication with Westbrooks, Fortkamp, or multiple HR employees. Lastly, as the City points out, some degree of informal accommodation had been made. Plaintiff admits she regularly used of a breathing machine at work, that both Westbrooks and HR were aware, and that she was not prohibited from such use. (*See* Doc. 86-1, Ex. 1 at 168:23-170:22, 171:9-23.) Unable to establish that she was either disabled or denied a reasonable accommodation, Plaintiff's ADA discrimination claim fails.

### b.  Count VI: Plaintiff's ADA Retaliation Claim

Unlike her claims for retaliation under Title VII and FMLA, Plaintiff has not shown that she engaged in a protected activity.  Therefore, her ADA retaliation claim fails.

### D.  Constructive Discharge

Plaintiff asserts that the conditions at her work led to her constructive discharge. (Doc. 55 at 6.) Constructive discharge occurs when "a reasonable person in [the employee's] position would have felt that he was forced to quit because of intolerable and discriminatory working conditions." *Satterwhite v. Smith*, 744 F.2d 1380, 1381-82 (9th Cir.

- 29 -

1984). A constructive discharge claim necessitates a higher standard than that of a hostile work environment. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 131 (2004). ("A hostile-environment constructive discharge claim entails something more: working conditions so intolerable that a reasonable person would have felt compelled to resign."); *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) ("Where a plaintiff fails to demonstrate the severe and pervasive harassment necessary to support a hostile work environment claim, it will be impossible for h[im] to meet the higher standard of constructive discharge[.]"). As discussed, Plaintiff's hostile work environment claim failed and even construed in the light most favorable to Plaintiff, the evidence does not suggest that the working conditions were so pervasive that a reasonable employee would need to leave. *See Brooks*, 229 F.3d at 930. At most, the evidence suggests that Plaintiff subjectively believed it was intolerable. *See Faragher* 524 U.S. at 787 (determining an objectionable environment must be both objectively and subjectively offensive). A constructive discharge claim, however, cannot succeed on purely subjective conjecture.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** GRANTING in part and DENYING in part Defendants' Motion for Summary Judgement, (Doc. 77). The motion is granted as to the first, third, fourth and sixth causes of action. The motion is denied as to the second (FMLA retaliation) and fifth (Title VII retaliation) causes of action.

Dated this 3rd[th] Day of September, 2020.

Honorable Susan M. Brnovich
United States District Judge